**Ethan Levi**, OSB No. 994255
Email: ethan@lmhlegal.com
**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

**Attorneys for Plaintiff**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **DALE PENNIE,**<br><br>                    Plaintiff,<br><br>       vs.<br><br>**CORRECT CARE SOLUTIONS LLC; WELLPATH LLC; PAUL A. BILDER, MD; KATHI WEAVER, RN; CLINTON BANNING, NP, RN; COOS COUNTY; SHERIFF CRAIG ZANNI; DARIUS MEDE; SGT. SHANE SHOBAR,**<br>                    Defendants. | Case No. 6:21-cv-00252<br><br>**COMPLAINT**<br>(Claims for Damages including Civil Rights Action under 42 U.S.C. § 1983, Professional Negligence, Negligence)<br><br>DEMAND FOR A JURY TRIAL |

## COMPLAINT

//

//

//

**INTRODUCTION**

1.

Dale Pennie suffered acute renal failure, nerve damage, and an enlarged, permanently leaking bladder as a result of Defendants' deliberate indifference to his medical needs. Defendants ignored and disbelieved Mr. Pennie though he persistently complained to them that he was unable to urinate. For five days, the defendants discounted Mr. Pennie's complaints, his girlfriend's complaints, and his lawyer's complaints until his bladder was so filled with urine that his kidneys failed, and his bladder was permanently injured. On the evening of May 11, 2019, the medical staff finally realized his kidneys failed and asked for his emergency release. Coos County Deputy, Sgt. Shane Shobar released Mr. Pennie to the hospital. Hospital medical staff quickly evaluated him, recognized his urethra was blocked and catheterized him. They drained almost two liters of urine from Mr. Pennie - nearly four times the volume of a normal, full bladder. Mr. Pennie left the hospital thirteen days later with a catheter and a permanently distended bladder compromised by nerve damage. The defendants' disregard for Mr. Pennie's frequent complaints caused permanent damage to his bladder, leaving him permanently incontinent and suffering from a number of permanent side effects and health risks.

Mr. Pennie is suing Correct Care (now renamed Wellpath, formerly ConMed), a more than $1 billion a year, for-profit corporation because its reckless, greed-driven practices led to Mr. Pennie's injuries. Correct Care contracted with the Coos County Sheriff to provide services, ostensibly "medical care," to jail inmates. Correct Care has a well-worn custom and practice of ignoring inmates' medical concerns in order to shirk its contractual obligations and make more money. It does not vet, supervise, or discipline any of its employees, no matter their obvious incompetence. It does not require that its employees abide by its written policies or provide medical

Page 2 – COMPLAINT

care that is consistent with the standard of care in the community. Mr. Pennie suffered the consequences and is now permanently injured.

Finally, Mr. Pennie sues Coos County and the Coos County Sheriff. These defendants entered into a contract with Correct Care, a company with a known and lengthy history of failing to provide adequate care to inmates at the Coos County Jail and to other prisoners in jails and prisons throughout the country. After entering into this contract, the Sheriff ignored Correct Care's blatant failures, went along with its self-serving explanations for its medical catastrophes, and refused to hold Correct Care to its contractual obligations to provide constitutionally adequate medical care to inmates such that Mr. Pennie was denied care and suffered permanent injury. The Sheriff ignores Correct Care's failure to abide by its contractual obligations because Correct Care does honor the one contract provision he actually cares about: an indemnity clause.

## JURISDICTION

2.

This court has jurisdiction over the subject matter of the First and Second Claims of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

3.

The Second Claim for Relief includes as a Defendant, a corporation that is a citizen of a different state from the plaintiff.  The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

4.

The Third, Fourth, and Fifth Claims for Relief, for professional negligence and negligence, arise under state law and are passed on the same operative facts as the First and Second Claims for Relief.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Page 3 – COMPLAINT

**VENUE**

5.

Venue is proper within the District of Oregon because all events giving rise to these claims occurred in this judicial district. 28 U.S.C. § 1391(b). Specifically, all of the acts and practices alleged herein occurred at the Coos County Jail in Coquille, Oregon.

**PARTIES**

6.

Plaintiff Dale Pennie is an adult resident of Oregon presently residing in the city of Bandon, Oregon. The defendants violated his right to be free from cruel and unusual punishment because the defendants were deliberately indifferent to his serious medical needs. He also brings state law claims of negligence against the defendants.

7.

Defendant Correct Care Solutions LLC (hereinafter "Correct Care") was a Delaware Corporation based in Kansas, licensed to do business in the State of Oregon. Correct Care Solutions was previously named Conmed Healthcare Management (hereinafter "Conmed"). After 2013, Conmed changed its name to Correct Care Solutions. Then, on July 1, 2019, after the events giving rise to this case, Correct Care Solutions LLC changed its name again to Wellpath LLC. Correct Care's, now Wellpath's annual revenues are approximately $1 billion. At all relevant times in this complaint, Correct Care contracted to provide health care to prisoners at the Coos County Jail, under color of law, pursuant to a contract with Coos County. Correct Care performed functions in the Coos County Jail traditionally performed only by state and/or municipal entities. Correct Care is liable under federal and state law for its own acts and the acts and omissions of its employees,

Page 4 – COMPLAINT

including those whose conduct contributed to Mr. Pennie's lack of proper medical care and his

resulting damages.

8.

Defendant Wellpath LLC is a Delaware Company, licensed to do business in the State of

Oregon. Wellpath was formally known as Correct Care Solutions. Although Wellpath was

incorporated in December of 2018 it did not replace Correct Care Solutions in contract with the

Coos County Jail until July 1, 2019. Wellpath is the successor in interest to Correct Care Solutions

LLC and is liable and responsible for Correct Care Solutions LLC's acts and omissions, and the acts

and omissions of Correct Care Solutions LLC's employees.

9.

Paul A. Bilder, M.D. (hereinafter "Dr. Bilder") was the medical doctor and provider

working at all relevant times for Correct Care, under color of state law, within the Coos County Jail.

He has a history of admitted ethical violations with the Oregon Medical Board.

10.

Kathi Weaver (hereinafter "Nurse Weaver") is a registered nurse licensed to practice in the

State of Oregon. She was also the Health Services Administrator for Correct Care, at the Coos

County Jail, while Mr. Pennie was incarcerated there. At all relevant times, Nurse Weaver was

acting within the course and scope of her employment with Correct Care and under color of state

law.

11.

Clinton Banning (hereinafter "Nurse Banning") is a registered nurse and nurse practitioner

licensed to practice in the State of Oregon. He was on the staff or under contract with Correct Care

at the Coos County Jail while Mr. Pennie was incarcerated there. At all relevant times, Nurse

LEVI MERRITHEW HORST PC

Banning was acting within the course and scope of his employment with Correct Care and under color of state law.

12.

Coos County is a public body liable under the laws of the State of Oregon for its own acts and for the acts and omissions of its law enforcement officers and other employees, including those whose conduct contributed to plaintiff's lack of medical care and resulting damages. It is also a "person" under section 1983 capable of being sued for its own constitutional violations.

13.

Sheriff Craig Zanni is the Coos County Sheriff.  He employs all deputy sheriffs including defendants Mede and Shobar. In the course of his duties as Sheriff, he delegated some of his duties and obligations to defendants Mede and Shobar and others, but remained ultimately responsible for setting jail policy, whom to employ, and with whom to contract with for inmate medical care. He was vested with ultimate executive authority to send inmates, including plaintiff, to medical providers for treatment.  Sheriff Zanni was responsible for ensuring the care, health and safety of Coos County inmates, including plaintiff. Sheriff Zanni was responsible for hiring and overseeing the work provided to Coos County Jail inmates by Correct Care and its employees. He was responsible for ensuring that Correct Care complied with its contract and followed its own policies and procedures. As Sheriff over the Coos County Jail, Zanni had a non-delegable duty to provide inmates with constitutionally adequate medical care. At all relevant times Sheriff Zanni acted under color of state law. He is sued in his individual capacity.

14.

Darius Mede is a Coos County Deputy Sheriff and was the Coos County Jail Commander at all relevant times. Defendant Mede was promoted or retained as Jail Commander by Defendant

Page 6 – COMPLAINT

Zanni. Sheriff Zanni delegated defendant Mede the responsibility for operating the Coos County

Jail. As Jail Commander, defendant Mede was employed in a supervisory capacity, overseeing other

Command Staff at the Jail. Defendant Mede was responsible for carrying out all jail operations,

creating jail policy, and was responsible for the care, safety and security of each inmate at the Coos

County Jail. As Jail Commander, defendant Mede, was responsible for ensuring that the jail enacted

and enforced policies sufficient to carry out the Sheriff's constitutional obligations including

ensuring that inmates received constitutionally adequate medical care at the jail. As Jail

Commander, defendant Mede was also responsible for ensuring that any medical contractor,

including Correct Care, complied with its contractual obligations. At all relevant time Mede acted

under color of state law. He is sued in his individual capacity.

15.

Sgt. Shane Shobar is a sergeant with the Coos County Sheriff's Office who at all relevant

times worked at the Coos County Jail. Sheriff Zanni is his employer; Commander Mede is his

supervisor. At all relevant times Sgt. Shobar was employed in a supervisory capacity, overseeing

other deputies at the Coos County Jail. As such, he was responsible for the care, safety and security

of inmates at the Coos County Jail. At all relevant times Shobar acted under color of state law. He is

sued in his individual capacity.

16.

At all times relevant, all defendants acted under color of state law.

**FACTUAL ALLEGATIONS**

17.

Mr. Pennie was incarcerated in the Coos County Jail beginning on January 14, 2019 after he

was sentenced to one year in jail for violating his probation on a misdemeanor case.

18.

The Coquille Valley Hospital is located about half a mile from the Coos County Jail.

19.

Mr. Pennie was incarcerated at the Coos County Jail with a number of pre-existing medical conditions including high blood pressure, diabetes, kidney stones, prostate problems and orthopedic problems including a painful right knee.

20.

His intake medical evaluation occurred on January 25, 2019. It appears that Dr. Bilder conducted that evaluation. In it, Dr. Bilder noted that Mr. Pennie had diabetes, high blood pressure, and "prostate issues of some kind." He also responded to the question, "Does patient exhibit characteristics of potentially being at risk for victimization (e.g., age, small build, femininity, 1st time offender, passive or timid appearance) if yes, explain" in the affirmative. He noted that Mr. Pennie was "weak, old." As detailed below, Dr. Bilder has a history of discipline regarding medical treatment involving catheters.

21.

On May 6, 2019, Mr. Pennie was unable to urinate. This came as quite a shock because he felt he had to urinate, but he simply couldn't make any urine come out. He also felt pain and pressure in his bladder, in his lower pelvis above his penis, and in his penis. Alarmed, he made several complaints about it to medical and correctional staff. Medical staff did not evaluate him until the next day.

22.

Beginning on May 6, Mr. Pennie was suffering from acute urinary retention. Acute urinary retention is a life-threatening medical condition requiring immediate emergency treatment.

23.

The next day, Tuesday, May 7th at approximately 11 a.m., after continuous complaints of pain and inability to urinate, Mr. Pennie informed a young female jail nurse that he had not urinated since May 6. This female nurse told Mr. Pennie she would schedule a visit with Dr. Bilder.

24.

The afternoon of May 7th, Dr. Bilder met with Mr. Pennie. Mr. Pennie told Dr. Bilder he hadn't urinated since May 6 and that his bladder felt full and that his lower abdomen and penis hurt. Dr. Bilder said, "I have a pill for that." Dr. Bilder prescribed Mr. Pennie Tamsulosin (a medication to treat prostate disease that Mr. Pennie had already been taking) and ordered a straight catheter.

25.

Three hours later, on May 7th at approximately 2 p.m., Mr. Pennie met with Nurse Weaver, who tried to place the catheter. Her attempt at catheterization failed and did not yield any urine. The process was painful and it felt like the catheter kept hitting against something that caused pain inside his penis and pelvic area. He told Nurse Weaver how it felt and she gave up trying and sent Mr. Pennie back to his cell, ignoring his complaints to her that his bladder still felt full. During the catheterization attempt and after, no medical staff member ever palpated Mr. Pennie's abdomen or performed a rectal examination. Both of these techniques are part of a work-up for complaints of a blocked urethra and will disclose an enlarged bladder. On information and belief, Nurse Weaver informed Dr. Bilder that the catheterization attempt failed. Dr. Bilder did not order any alternative treatment to deal with Mr. Pennie's life-threatening medical condition. Neither Dr. Bilder nor Sheriff Zanni ordered that Mr. Pennie be sent to the hospital to treat his life-threatening medical condition.

LEVI MERRITHEW HORST PC

26.

On Wednesday, May 8th, Mr. Pennie continued to complain that he had not urinated in two days. Nurse Weaver moved him to a holding cell for medical observation. A male nurse told him he had to stay in that cell until he urinated. The new cell had no toilet, and Mr. Pennie was not provided with a portable urinal. To ensure that Mr. Pennie did not urinate or defecate on the floor of his cell, deputies came by periodically and asked Mr. Pennie if he had to use the bathroom. Although Mr. Pennie left this cell to defecate, he was physically unable to urinate because his urinary tract was blocked. No medical interventions were attempted on May 8th, and neither Dr. Bilder, Nurse Weaver, nor Sheriff Zanni ordered that Mr. Pennie be sent to the hospital to treat his life-threatening medical condition. Mr. Pennie remained in this holding cell until he was transported to the hospital on the late afternoon of May 11th.

27.

On Thursday, May 9th, Mr. Pennie continued to tell the medical staff and the jail staff that he could not urinate and had not urinated for three days. Mr. Pennie called his significant other, Susan Billings, and told her about his medical predicament and that nobody believed him. Susan Billings called the jail immediately and spoke to Nurse Weaver. Ms. Billings politely demanded that Nurse Weaver draw blood and check his kidney function. Nurse Weaver wrote a progress notes about her interactions with Mr. Pennie, "Ptn, continues to report trouble urinating, unsure as toilet noted by PM shift with feces and yellow in bowl of toilet, provider contacted." She also recorded an interaction after the fact. On a May 13th note (a note written two days after Mr. Pennie was emergently released to the hospital), she wrote, "Additional note – on 5/9 PM shift nurse also inserted straight catheter with no urine return." Notably, the shift nurse, Nurse Banning, never made any note whatsoever that he tried to catheterize Mr. Pennie.  Mr. Pennie vividly remembers this

LEVI MERRITHEW HORST PC

attempt and that it drew blood but no urine. Mr. Pennie asked Nurse Banning whether that blood came from his bladder and Nurse Banning responded that he didn't think so. Nurse Banning never once palpated Mr. Pennie's abdomen or performed a rectal examination, both crucial parts of a work-up for complaints of a blocked urethra. On May 9, after the second catheter drew no urine, and Mr. Pennie had not urinated in four days, neither Nurse Weaver, Nurse Banning, Dr. Bilder, Sheriff Zanni, Darius Mede, nor Sgt. Shobar ordered Mr. Pennie to the hospital to treat his life-threatening medical condition.

28.

Also on May 9th, Mr. Pennie's Habeas Corpus attorney, Jon Reagan, visited Mr. Pennie at the jail. Mr. Pennie told Mr. Reagan that he had not been able to urinate and that he was afraid for his kidneys and his bladder. This concerned Mr. Reagan, who immediately met in person with Nurse Weaver and a defendant correctional deputy – likely this was either defendant Shobar or Mede but could have been another correctional deputy. Mr. Reagan told both Nurse Weaver and the other defendant correctional deputy, about Mr. Pennie not being able to urinate and his concerns about his kidneys. Both Nurse Weaver and the other defendant correctional deputy told Mr. Reagan they believed that Mr. Pennie was not being sincere about his symptoms. They reassured Mr. Reagan they would do everything that was *medically necessary* for Mr. Pennie. Mr. Reagan left the jail hopeful that Mr. Pennie would get the treatment he needed.

29.

Upon information and belief, defendant, Jail Commander Mede learned either personally, through Sgt. Shobar, or through other correctional or medical employees of Mr. Pennie's life-threatening medical condition. Upon information and belief, Darius Mede did nothing to remedy Mr. Pennie's inability to urinate.

Page 11 – COMPLAINT

30.

On Friday, May 10th, Mr. Pennie was still unable to urinate. His bladder felt increasingly full and he felt increasing pain. Despite being unable to drain Mr. Pennie's bladder during two catheter attempts, medical staff recommended that Mr. Pennie drink Gatorade for electrolyte replacement. Mr. Pennie drank the Gatorade as recommended. This filled his bladder even more and caused him even more pain and discomfort. In the afternoon, in response to Susan Billings' demands, the medical staff finally drew Mr. Pennie's blood for lab testing. Nurse Weaver told Mr. Pennie she would review the lab results as soon as they arrived. When her shift ended, after taking the blood sample, she left for the weekend. Neither Nurse Weaver, Dr. Bilder, Sheriff Zanni nor any other defendant ordered Mr. Pennie to the hospital for treatment of his life-threatening medical condition.

31.

On Saturday, May 11th, medical staff received blood test results which clearly showed Mr. Pennie in acute kidney failure. Nurse Weaver did not demand that Mr. Pennie be emergently released despite suffering a life-threatening condition. Instead, Nurse Weaver contacted Dr. Bilder to consult with him about next steps. Hours later, in the late afternoon the same day, two deputies came to Mr. Pennie's cell and told him he was leaving and ordered him to take a shower. Without knowing where he was going, Mr. Pennie was shackled, chained, placed in a wheelchair and transported to the Bay Area Hospital.

32.

At the hospital, labs were drawn, and a sonogram revealed that his bladder was full and distended. The medical staff also quickly diagnosed Mr. Pennie with acute renal failure due to severe bladder obstruction secondary to a severely enlarged prostate. The hospital staff placed a Foley catheter in Mr. Pennie and drained 1600 ml of fluid from his bladder. He was admitted to the

LEVI MERRITHEW HORST PC

hospital and two days later the Foley catheter was removed with no urine output after six hours. The catheter was replaced and more urine was drained. Prostate surgery was performed, but he could still not urinate. A second surgical procedure was performed, but dysuria continued. After this second surgery, a permanent catheter was placed.

33.

On May 24th, Mr. Pennie was discharged home with his new catheter because the jail could not provide adequate medical care for Mr. Pennie.

34.

On May 31, 2019, a follow-up appointment with Mr. Pennie's primary care physician noted a 40-pound weight loss.

35.

As a result of his poor medical treatment in the jail, Mr. Pennie's bladder was full for so long it had stretched and become flaccid. His bladder does not work properly anymore. He now must either wear a catheter in order to urinate or wet his pants. Mr. Pennie's bladder is unlikely to recover and he will likely suffer incontinence for the rest of his life. Catheters place him at a severe risk for urinary tract infections. Doctors will need to monitor his kidney function for the rest of his life due to the risk of permanent kidney damage.

**CORRECT CARE**

36.

Correct Care is a privately held, for-profit company owned by a large venture capital firm, HIG Capital. Correct Care was previously known as Conmed Healthcare Management until after 2013, when it changed its name to Correct Care Solutions LLC. Correct Care changed its name again in 2018 to Wellpath. Correct Care has engaged in contracts with jails and prisons throughout

LEVI MERRITHEW HORST PC

the United States agreeing to provide medical care to inmates. This medical care is normally

provided by municipalities and governmental entities and is constitutionally required. In this case,

Correct Care entered into a contract to provide medical care to inmates at the Coos County Jail.

**TERMS OF ITS CONTRACT WITH COOS COUNTY**

37.

Correct Care's motive as a for-profit company is to minimize costs and maximize profits. Its

contract with the Coos County Jail reflects this motive and does not bind Correct Care to provide

even a basic level of care to any prisoner. The contract does more to exempt Correct Care from

responsibility rather than provide adequate medical care to prisoners.

One of the key provisions of the contract is Correct Care's promise to staff the jail with the

following:

1. A Health Services Administrator eight hours a day from Monday through Friday.

2. A Registered Nurse eight hours a day on Saturday and Sunday.

3. The Medical Director two hours a day on Monday.

4. A Physician's Assistant or Nurse Practitioner two hours a day on Tuesday and Friday.

5. A Psychiatric Nurse Practitioner or Physician's Assistant for two hours a day on Monday.

6. A Mental Health Professional for four hours a day on Monday, Wednesday and Friday.

7. An Administrative Assistant eight hours a day from Monday through Friday.

8. An evening shift Registered Nurse eight hours a day, seven days a week.

Page 14 – COMPLAINT

Although this provision of the agreement is in writing, another part of the contract forgives Correct Care from understaffing the jail: "CCS shall make reasonable efforts to supply the staffing levels contained in this section, however, failure to continuously supply all of the required staffing due to labor market demands or other factors outside the control of CCS, after such reasonable efforts have been made, shall not constitute a breach of this AGREEMENT." 2.0.3.

The contract with Coos County exempts Correct Care from providing off-site medical care for any inmate that comes to the jail with a pre-existing condition. 5.2.

The Correct Care contract exempts Correct Care from responsibility for any costs incurred by inmates who have been released from custody. 4.2

The Correct Care contract exempts Correct Care from responsibility for any costs of medical services for any individual injured during transport to or from the jail. 4.2

The contract with Coos County requires Correct Care to identify to the Sheriff each and every inmate with a medical or mental health condition which may be exacerbated by incarceration and requires the Sheriff to make every effort to release, transfer, or remove that inmate from the correctional setting so as not to incur costs for Correct Care. 7.1

The contract with Coos County exempts Correct Care from responsibility for vision care. 1.18

The Correct Care contract exempts Correct Care from responsibility for dental care.

The Correct Care contract limits Correct Care's liability for any and all costs incurred for any of the following services to $20,000 in the aggregate per year. All costs exceeding $20,000 in the aggregate of the following must be borne by Coos County:

1.  Ambulance service

2.  Hospitalization

3. Medical equipment with a per unit cost over $100

4. Mental Health Care

5. Pathology/Radiology Services

6. Pharmacy Services

7. Pregnancy Services

8. Any service requiring a specialized medical provider

For this contract, Coos County paid, nominally, $631,120.20 a year. In exchange, Correct Care agreed to indemnify Coos County, its officials, agents and employees from and against any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind whatsoever caused by, based upon or arising out of any act, conduct, misconduct or omission of Correct Care, its agents etc. Upon information and belief, it is for this provision that Sheriff Zanni and Coos County bargained for, not for the adequate medical care of the prisoners held in their care.

**CORRECT CARE HAS A PATTERN, PRACTICE AND CUSTOM OF PROVIDING SUBSTANDARD CARE**

38.

As shown in the following, Correct Care has a pattern and practice and custom at the Coos County Jail of disbelieving inmate medical complaints without properly evaluating them. Correct Care has a pattern and practice of not disciplining its employees and contractors after they ignore medical and nursing protocols. Correct Care has a continuous quality improvement program it often does not implement. Correct Care has a pattern and practice of hiring workers who are often cheaper because they are less qualified or because they are professionally hobbled by a history of misconduct. Correct Care has a pattern and practice of understaffing the jail to save money. Correct Care has a pattern and practice of failing to closely supervise its workers. Correct Care has a pattern and practice of filling roles it has contracted to fill with nurses, nurse practitioners, physician's

Page 16 – COMPLAINT

assistants and doctors with minimally qualified emergency medical technicians and paramedics. Correct Care has a pattern and practice of failing to live up to its contract by failing to identify inmates whose medical condition may be exacerbated by further incarceration to the jailor, so the jailor may release them.

39.

Mr. Pennie's treating physician from Correct Care, Dr. Paul Bilder, has a record of discipline with the Oregon Medical Board beginning in 1999. In 1999, Dr. Bilder stipulated that "there is evidence from which the Board could find that Licensee [Dr. Bilder] engaged in paragraph two and that this conduct violates ORS 677.190(1), unprofessional or dishonorable conduct, as defined in ORS 677.188(4)(a) and (b); and ORS 677.190(14), gross negligence or repeated negligence in the practice of medicine." Paragraph two described many different acts of misconduct with several of his patients. Notably, two acts involved Dr. Bilder's acts with respect to Foley catheters. In the first instance he refused to place a Foley catheter in a patient who needed one. In the second, he ordered a nurse to remove a Foley catheter from a patient who needed one, contrary to the wishes of the patient and his family. This record of discipline is a public record that was available both to Sheriff Zanni and Correct Care before Mr. Pennie was injured. Despite this record of repeated gross negligence, no one made any attempt to monitor Dr. Bilder's practice at the Coos County Jail, including his practices surrounding the use of catheters.

40.

Dr. Bilder is emblematic of Correct Care's complete lack of oversight, quality control, and commitment to following proper medical protocols. Correct Care has a pattern and practice of failing to train its workers to adequately provide medical treatment and failing to follow up on deaths and other serious medical neglect with constructive criticism and systemic changes. Instead

LEVI MERRITHEW HORST PC

of providing adequate care, it buys insurance. This is precisely what Correct Care provides to jails—

not adequate medical care, just an insurance policy and an indemnity clause.

1. **OTHER CASES AT THE COOS COUNTY JAIL INVOLVING CONMED/CORRECT CARE MISCONDUCT**

41.

Norris Giles was housed at the Coos County Jail from February 28, 2013 to March 27, 2013.

During his incarceration he repeatedly complained to medical and correctional staff about

abdominal pain, vomiting, lack of a bowel movement and blood in his stool. At the time of Mr.

Giles's incarceration, Dr. Antola was the provider at the Coos County Jail and Nurse Hausler was

the Health Services Administrator. The bulk of the medical work, however, was conducted by

emergency medical technicians (EMT).

After Dr. Antola's initial evaluation and despite including an intestinal obstruction as a

possible cause of his complaints, Dr. Antola never followed up with any medical testing. Instead,

she chose to disbelieve his repeated and loud complaints and isolate him in booking. In addition to

his complaints, Nurse Hausler and Dr. Antola ignored other complaints about Mr. Giles's

wellbeing. They ignored a written complaint lodged by a group of other inmates at the jail; they

ignored complaints from Mr. Giles's close friend who called repeatedly requesting that the jail send

Mr. Giles to the hospital. Ironically, in one recorded call between Mr. Giles, and his close friend (a

medical lay-person) his close friend diagnosed Mr. Giles with exactly what he had - an intestinal

obstruction.

By luck and happenstance, Mr. Giles was released on March 27th before his sentence was

served. He had lost approximately 40 pounds. As soon as he was released from the jail into the cold

spring rain, he collapsed on the sidewalk outside the jail door. An ambulance brought Mr. Giles to

the hospital where he was immediately diagnosed with malnutrition, dehydration and after a CT

LEVI MERRITHEW HORST PC

scan, with a bowel obstruction. Mr. Giles spent a total of 13 days in the hospital and suffered complications from surgery.

42.

Ronald Taylor was booked into the Coos County Jail on October 20, 2013. In November, he developed a very painful and swollen testicle. He first sent a kyte about the issue on November 17th, stating his testicle was painful and swollen. On the same date, EMT Kyle Smith said that Mr. Taylor should be moved to the booking area for medical observation. Mr. Smith tested Mr. Taylor's urine and noted that it contained traces of blood. Mr. Smith documented a phone call with Health Services Administrator Ms. Hausler, who told Mr. Smith to start Mr. Taylor on antibiotics. Mr. Taylor was returned to his regular cell block that same night.

Mr. Taylor sent additional requests for medical treatment on November 18 (testicle swollen "to that of half a corn cob") and November 19 (testicle swollen "to that of a baseball" – similar to problem diagnosed by Coos Bay Hospital in July 2013 – asks for help "before I lose this or both testicles"). In response to one of the kytes, an EMT at the jail told Mr. Taylor he needed time to let the antibiotics work.

On November 21, an EMT at the jail spoke to Mr. Taylor about his swollen testicle and the EMT saw the swollen testicle. The EMT spoke to Ms. Hausler who recommended that Mr. Taylor continue the antibiotics and that Mr. Taylor would be seen by a doctor on Saturday, November 23.

On November 23, Mr. Taylor finally saw Dr. Blum who sent Mr. Taylor to the emergency room the same day. Unfortunately, Mr. Taylor's testicle was so compromised by the time he got to the hospital it had to be removed.

//

//

Page 19 – COMPLAINT

//

43.

Donnie Ray Brown was a prisoner at Coos County Jail during the same time as Mr. Taylor. Mr. Brown died as a result of negligent care he received at the Coos County Jail. His cause of death was "intraabdominal sepsis due to a visceral perforation secondary to duodenal perforation that had been present for quite some time, . . . at least several days."

During Mr. Brown's incarceration, Conmed had no medical provider assigned to the Coos County Jail. The staffing was as follows: Nurse Hausler was the Health Services Administrator and undertook the day-to-day nursing duties. Additionally, Judith Stensland, a nurse practitioner would visit the jail each week, though she was not assigned to the jail. Supplementing Nurse Hausler and Judith Stensland were EMTs DeLeon and Morgan, who had little capacity as health care workers and no professional capacity to diagnose and treat anyone.

Mr. Brown was serving a 30-day sentence. Beginning on November 12, Mr. Brown showed signs of distress including difficulty breathing and chest pain. He saw Nurse Hausler once, on November 12, 2013. On November 14 he saw Judith Stensland, NP one time, for less than ten minutes. During that visit, he stood in a doorway and complained of shortness of breath and swollen ankles. Nurse Practitioner Stensland examined his abdomen and noted that it was "somewhat tense, no mass but difficult to exam [due to] voluntary tensing of the muscles." She later reported she believed that Mr. Brown was tensing his abdomen on purpose and that that "he may be exaggerating his abdominal pain, if he had any." She prescribed Immodium, as needed, for diarrhea.

On November 18th, Nurse Hausler left for a Conmed conference in Nashville, Tennessee. The conference was scheduled to go through November 21st, the day Mr. Brown died. Nurse Hausler did not make arrangements for any other nurse to fill her role while she was out of town.

LEVI MERRITHEW HORST PC

The only people available to administer treatment to Mr. Brown were the EMTs. On November 18, a jail deputy heard Mr. Brown moaning and sounding as if he was in pain. Mr. Brown had a hard time sitting up on his bunk and he was holding his stomach. Mr. Brown told the deputy he felt worse than before. After conferring with a sergeant, he moved Mr. Brown to booking for observation at about 5:00 a.m. To get him to booking they had to transport Mr. Brown in a wheelchair. The jail deputy spoke to EMT Morgan when he arrived at the jail and made him aware of Mr. Brown's symptoms. EMT Morgan saw Mr. Brown in booking and spoke with him for less than 90 seconds. Mr. Brown reported he had been constipated for 5-6 days. He also showed EMT Morgan the toilet which was full of light orange urine. Mr. Brown asked whether he was peeing blood. EMT Morgan told him that he was simply dehydrated. Mr. Brown asked to go to the hospital but EMT Morgan refused because "nothing shows anything wrong." On November 19, EMT Morgan saw Mr. Brown at 12:46 p.m. for less than four minutes. Mr. Brown told EMT Morgan that he had diarrhea while he was sleeping during the night. EMT Morgan apparently concluding that since he had defecated all was well, decided to return Mr. Brown to general population.

On November 21, Nurse Practitioner Stensland was scheduled to visit the jail and to meet with Mr. Brown. She did not come to the jail that day. That morning, a jail deputy spoke to Mr. Brown several times about when we would be able to see a doctor. The deputy noted that Mr. Brown was either lying on his bunk or facing the wall while sitting on his toilet. At 1 p.m. other inmates told a deputy that Mr. Brown needed to speak with him. Mr. Brown then asked when he would be able to see a doctor and asked if he could be released early due to his condition [he had only one day left to serve]. The deputy responded that the medical department and the sergeant would have to make that decision. Mr. Brown asked, "What do I have to do to get out of here, faint again?" Mr. Brown then returned to his cell. The deputy noticed that Mr. Brown's face seemed

gaunt and sunken and his skin grayish. He reported these observations to EMT Morgan. At 2 p.m.

EMT Morgan came to the cell to speak with Mr. Brown. EMT Morgan documented that Mr. Brown

"started acting like he was having a hard time walking [and] in pain" once he saw EMT Morgan.

EMT Morgan noted that he "was informed that earlier [inmate] was asking if he could be released

early." Mr. Brown reported he was still constipated and wanted something to relieve it. EMT

Morgan gave him some medication for constipation and told him to drink fluids. At 3:10 p.m. an

inmate told a deputy that Mr. Brown needed medical help because he was throwing up blood. The

deputy called EMT Morgan and Mr. Morgan told the deputy to send Mr. Brown to booking for

evaluation. At 3:20 p.m. a deputy escorted Mr. Brown to booking. He noted that "Mr. Brown was

holding his chest and his respiration was short and fast. [Mr.] Brown's skin had a yellow tint to it."

Mr. Brown grabbed his blankets and began walking, but he told the deputy "that he didn't think he

was going to be able to walk to booking." At approximately 3:23 p.m., the deputy sent for a

wheelchair and Corporal Shane Shobar pushed Mr. Brown in a wheelchair to booking. At booking

EMT Morgan took Mr. Brown's temperature. He was feverish. His blood pressure was high. His

oxygen saturation was low. After 25 minutes in booking the jail and medical staff jointly decided

not to get an ambulance and instead gave Mr. Brown a "courtesy ride to the hospital." A courtesy

ride was a way of ensuring that neither Conmed nor the Coos County Sheriff would be responsible

for paying for an ambulance ride. He was officially released at 3:50 p.m. but did not leave the jail

until 4:14 p.m. The ride took two minutes and he arrived at the hospital at 4:16 p.m. He died at the

hospital 6 hours later of sepsis.

Sepsis is a serious condition resulting from the presence of harmful microorganisms in the

blood or other tissues and the body's response to their presence, potentially leading to the

malfunctioning of various organs, shock, and death. Sepsis is treatable if it is identified and treated quickly, and in most cases leads to a full recovery with no lasting problems.

After Mr. Brown's death, Conmed began a Mortality and Morbidity review. The mortality and morbidity review is designed to aid the medical and correctional staff to learn what went wrong and caused a bad outcome and what could be done in the future. A Mortality and Morbidity review process is part of a continuous quality improvement program. Nurse Hausler prepared for the Mortality and Morbidity review by summarizing Mr. Brown's medical records to piece together the timeline of Mr. Brown's care before his death. When she presented her findings to the panel she never provided Mr. Brown's medical records or her written summary to the panel. The panel was staffed by and directed by Nurse Hausler, a person with an obvious conflict of interest in that her failure to staff the jail when she left for her conference contributed to the cause of Mr. Brown's death. In addition to Nurse Hausler, the panel also included EMT Morgan who was equally conflicted and at the jail when Mr. Brown died. Besides these two, the panel included Sheriff Zanni, Sergeant Mede and two other members of the Sheriff's Office. Ms. Hausler read her report and they discussed it for between thirty minutes and an hour. The report concluded as follows:

> "Staff was responsive to patient's concerns at each encounter. An assessment occurred at each encounter; a plan of care was determined and implemented. Patient never personally accessed or requested health care; each encounter occurred as a result of a referral from a staff member or another inmate. Observations of the patient's overall activities and behavior between encounters demonstrated an individual participating without difficulty in the normal daily activities of jail life. Care was provided commensurate with community standard of care. All applicable procedures were followed.

> "All staff is current in training. On-going education and training is always important to keep skill levels"

> "Staffing was adequate. Skill level of staff was appropriate. Reports were complete and accurate. Entries in the health care record were complete and appropriate."

> Were there factors that may have led to this incident that need to be addressed through changes or adoption of policies, procedures or training? "None."

Page 23 – COMPLAINT

LEVI MERRITHEW HORST PC

Other recommendations: "Not at this time."

Despite Mr. Brown dying of a treatable medical condition while in Coos' jail custody, not one critical voice was raised nor one medical conclusion questioned during the panel review. Despite not having a medical provider assigned to the jail when Mr. Brown died, despite the failure of Conmed staff to believe Mr. Brown's complaints, despite Ms. Hausler flying to Nashville and abandoning the jail during Mr. Brown's sickness, despite the failure of Ms. Stensland to medically evaluate Mr. Brown, Nurse Hausler's Mortality and Morbidity report found no issues, led to no discipline, no conclusions about what to do better next time, nor led to a single policy change. This result is unsurprising given that Nurse Hausler, the person most responsible for Mr. Brown's death, was responsible for crafting and whiting-out her staff's complete medical failure. As the most senior medical member of the Mortality and Morbidity panel, she absolved herself and Conmed of any wrongdoing.

44.

Rocky Stewart was only an inmate in the Coos County Jail for ten hours before he died on December 3, 2017 of coronary artery disease. Arrested for a fight with his brother, he was left to languish in a holding cell after vomiting. After his detention in the holding cell, correctional deputies saw him vomit several more times, in obvious distress. In addition, medical workers walked by Mr. Stewart's cell, learned of his distress but not a one assessed, evaluated or determined the cause of his symptoms. He was found dead and rigid in his cell the next morning at breakfast. At the time of Mr. Stewart's death, Correct Care's contract with the Coos County Jail mandated that:

> RECEIVING SCREENING. A receiving screening . . . shall be performed as soon as possible after the [inmate] is booked into the jail, not to exceed 24 hours after the [inmate's] arrival at the jail.

LEVI MERRITHEW HORST PC

1.1.1.  HEALTH ASSESSMENT. A health assessment of a[n] [inmate] shall be performed as soon as possible, but no later than fourteen (14) days after the INMATE/DETAINEE's arrival at the jail. The health assessment shall follow current NCCHC guidelines. . .

5.2     . . . [Correct Care Solutions] shall provide such care as is medically necessary until the arrested person can be transported to a medical care facility by the arresting agency or their designee. . .

Correct Care Solutions failed Mr. Stewart in all its contractual obligations and left him to die without any effort to assess, evaluate, and treat his symptoms.

## 2. CONMED'S CANCELLED CONTRACTS FOR EGREGIOUS BREACH

### Pierce County Washington

45.

In January, 2014, Conmed signed a contract to become the healthcare provider at the Pierce County Jail in Tacoma, Washington. In August, 2015, Pierce County cancelled the contract citing a litany of breaches. When Conmed sent a demand to Pierce County for payment, the Pierce County Prosecutor sent a letter to Conmed laying out the many areas where Conmed was in default:

> Failure to verify medications at booking; delay in care; poor quality of care; very poor record keeping at every level; failure to triage; lag times in getting reports, etc. to providers; continued staff shortages and almost weekly turnover; constant lack of leadership; lack of trained personnel, unscheduled shifts; failure to provide basic services; inmate requests for medical services not timely reviewed or addressed; significant pharmacy problems; inmates not getting their medications, staff failure to keep medical records on patients; and a myriad of problems created by ERMA.

The letter continued: "Indeed, the only things that Conmed can fault the County for are (1) believing Conmed when they made assurances that they would implement measures to bring their operation of the clinic up to medical standards and (2) giving Conmed time to accomplish it." The letter

Page 25 – COMPLAINT

LEVI MERRITHEW HORST PC

explained that "[a] lawsuit against Pierce County would flush out Conmed's deplorable performance in running the clinic, which would not only result in considerable cost and embarrassment to CCS/Conmed, but would also provide evidence to support claims filed by other institutions who suffered the same disappointment as Pierce County." The letter noted that the County "compiled independent, detailed documentation of countless errors by CCS/Conmed staff" that "will shock the conscience of the court." The letter concluded by stating that "[a] jury would likely find that CCS/Conmed's operation of the jail medical clinic was incompetent, unprofessional and morally reprehensible."

The Pierce County Prosecutor was correct because on March 7, 2019, a jury awarded Pierce County $1.56 million dollars in damages.

### Fulton County Georgia

46.

Five prisoners died at the Fulton County, Georgia jail within 75 days of each other in 2017. During this period Correct Care Solutions had contracted to provide both medical and mental health care to prisoners there. One of the deceased prisoners was Ligwenda Metts, aged 53. Ms. Metts had been in jail for 200 days for violating her probation. She complained of pain and trouble breathing at 6:36 a.m. on October 18, 2017. A nurse was alerted and scheduled Ms. Metts for sick call. Two minutes later an officer found Ms. Metts lying on the floor naked. A nurse responded and Ms. Metts was unable to respond to the nurse's questions. After checking Ms. Metts's pulse, the nurse "walked out and indicated there were no medical concerns." At 7:14 a.m., Ms. Metts was dead.

Mr. Green was another prisoner who died at the Fulton County Jail. He was a diabetic and mentally ill. He was booked into the jail despite dangerously high glucose levels. The first doctor that saw Mr. Green prescribed insulin, but he never received it. A second doctor who saw Mr.

Page 26 – COMPLAINT

Green said that the first doctor had prescribed the wrong insulin so changed Mr. Green's

prescription. Mr. Green never got the second prescription either. After that, Mr. Green refused to

cooperate, and the medical staff did nothing further. He was eventually hospitalized and died four

days later.

As a result of these deaths, Fulton county terminated its contract with Correct Care. In her

October 30, 2017 letter of termination, Felicia Strong-Whitaker, the Fulton County Purchasing

Director listed Correct Care's material breaches including: inadequate supervision of employees,

failure to follow protocols, insufficient staffing and "five deaths at the Fulton County Jail in the last

seventy-five days, with the sole link amongst all five inmates being that they all were being

medically treated by CCS/MSM."

### 3.  OTHER LAWSUITS AGAINST CORRECT CARE

47.

As of 2018 according to a document generated by Correct Care, in a ten-year period it had

been sued almost 1400 times. Each lawsuit is a public record and available to any citizen including

the Coos County Sheriff.

Just from 2014 through July 2018, a litany of lawsuits were filed against Correct Care for

medical malpractice and constitutional medical neglect. All of these lawsuits document the chronic

failure of Correct Care medical personnel to take a patient's complaint seriously and work up a

medical diagnosis. A sampling of these lawsuits is listed below, most taking place in Colorado, and

do not begin to represent the totality of lawsuits throughout the nation.

1.  Jennifer Lobato, 38, was suffering heroin withdrawal at the Jefferson County Jail

in Golden, CO. Despite vomiting profusely, she was told she would not receive

LEVI MERRITHEW HORST PC

treatment until she cleaned her vomit. Approximately 20 minutes after her requests for medical treatment were ignored, she was dead.

2. Kenneth McGill, 42, suffered a stroke while in the Jefferson County, Colorado Jail. Correct Care staff ignored his pleas for medical care for 16 hours. He suffered irreversible damage which left him with a limp and prone to dizzy spells. A jury awarded him $11 million.

3. A prisoner at the Weld County Jail in Greeley, Colorado told the intake nurse he had taken 70 valiums. The nurse did not believe him and did not authorize treatment. He died the next day.

4. At the Arapahoe County Jail, Jeffery Lillis died of easily treatable bacterial pneumonia and sepsis. Correct Care staff ignored his pleas for treatment for days.

5. At the Mesa County Jail, Tomas Beauford who had the mental capacity of a six-year-old suffered multiple epileptic seizures before he died. Correct Care employees refused to provide him his anti-seizure medications.

6. Tanya Martinez was booked into the Pueblo County Jail. She was suffering from alcohol withdrawal. As a guard delivered dinner, she suffered a seizure. The guard asked the nurse to look in on her, but the nurse did not. Martinez died shortly after.

7. John Walter was at the Fremont County Jail when he died of withdrawal from prescription Klonopin. He had lost 30 pounds in less than three weeks.

8. Dillon Blodgett hanged himself at the Montrose County Jail. He had advised Correct Care staff that he was suicidal when booked. He was placed in

Page 28 – COMPLAINT

maximum security solitary confinement. He was never properly assessed or placed on suicide watch. He was found hanging in solitary confinement. He died three days later.

9. On January 17, 2017, ReGina Thurman died of a torn aorta while at the Jackson County, Missouri Jail. She had complained about chest pain and that her legs were numb. Neither the jail guards nor the Correct Care medical staff took her complaints seriously. One jailer told Ms. Thurman that she was suffering from "Jailitis." Paramedics were not called until Ms. Thurman had no pulse.

**SHERIFF ZANNI and DARIUS MEDE**

48.

Sheriff Zanni was aware of and disregarded his duty to provide adequate medical care to his inmates. Sheriff Zanni has a history of failing to oversee Correct Care's contractual obligations and failing to hold Correct Care and its employees to its contractual terms. Sheriff Zanni abandoned his non-delegable duty to his prisoners and instead depended on a contract with Correct Care that promised to hold him and his employees harmless from lawsuits concerning inmate medical care. Sheriff Zanni is well aware that Correct Care does not provide constitutionally adequate care to the prisoners he has a legal obligation to care for. He does not care because Correct Care indemnifies his agency. This is the sole function of the Coos County contract with Correct Care.

49.

Oversight of private contractors is the single responsibility of a sheriff who surrenders his constitutional obligations to private contractors. In 2018, when Broward County, Florida Sheriff Israel switched medical providers from Armor to Correct Care Solutions, Fort Lauderdale Attorney Greg Lauer said, "It's all about oversight with these private companies. At their core, every for-

Page 29 – COMPLAINT

profit correctional healthcare company is the same, and they are trying to do what for-profit companies do, and that is to make money. If the Sheriff does not devote appropriate resources to meaningful oversight, then Correct Care Solutions will do what it was designed to do, and that is to turn a profit at the expense of the inmates and taxpayers." Lauer also said that Sheriff Israel "failed to supervise [Armor] and as a result Armor made a profit, but many people died horrible deaths." "New Broward Jail Healthcare Provider Has Grim History of Lawsuits, Deaths," *Florida Bulldog*, June 25, 2018.

50.

Sheriff Zanni did not devote adequate resources to oversee the contract with Correct Care. He ignored the company's publicly available, well-documented history of medical neglect and has not once imposed any meaningful remedies or negotiated any amendment in response to Correct Care's failures. He has not paid attention to Correct Care's malpractice nationwide and has never sought options to medically staff the jail besides Conmed/Correct Care/Wellpath.

51.

Sheriff Zanni has failed to hold Correct Care to its contract terms. He has not enforced the staffing levels Correct Care promised to provide. He has not enforced that a properly credentialed professional is assigned to each staffing role. He has not requested a daily list of sick inmates from Correct Care to ensure they are being properly triaged and treated. He has not reviewed Correct Care's medical records to ensure adequate performance of its contract. He unquestioningly surrendered to Correct Care's self-serving mortality and morbidity review process in Mr. Brown's case. He never verified or questioned its conclusions with medical records or independent investigation. He has not requested monthly health care reports as set forth in the contract. He has not requested quarterly meetings with Correct Care employees as set forth in the contract.

Page 30 – COMPLAINT

52.

Defendant Mede failed in his duties as Jail Commander similarly to Sheriff Zanni. As Sheriff's Zanni's delegate, he had a duty to enforce the contract with Correct Care and hold Correct Care to its contractual obligations. Mede also had a duty to ensure that prisoners received constitutionally adequate medical care. On information and believe, defendant Mede did not fulfill his duties and as a result, Mr. Pennie was injured.

**FIRST CLAIM FOR RELIEF**

**Cruel and Unusual Punishment through Deliberate Indifference to Serious Medical Needs, in Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution: (Against, Dr. Paul Bilder, Nurse Kathi Weaver, Nurse Banning, Sheriff Craig Zanni, Darius Mede, and Sgt. Shane Shobar in their individual capacities, a claim arising under 42 U.S.C. § 1983 )**

53.

Plaintiff needed medical care throughout the period of his incarceration.  The care he needed was essential to prevent serious physical injury and death.  The life-threatening nature of his condition was evidenced by his inability to urinate, his abdominal pain and pain in his penis, the blood test values showing that he was in acute renal failure, his overfull bladder, and the risk it would rupture.

54.

Defendants employed by the Coos County Sheriff and Correct Care/Wellpath, including all the named Defendants in this complaint were aware of a substantial risk of harm to Plaintiff through information from the following sources:

a) Defendants' observations of Plaintiff;

b) information provided to Defendants by Plaintiff;

c) information provided to Defendants by other inmates incarcerated with Plaintiff, and;

Page 31 – COMPLAINT

d) information provided by other Defendants employed in the Coos County Jail.

55.

The Defendants were aware of a substantial risk of harm to Plaintiff through one or more of Plaintiff's symptoms displayed and/or reported to them, including:

a)  Symptoms reported by plaintiff;

b)  Symptoms reported by other inmates;

c)  Symptoms reported by plaintiff's attorney, Jon Reagan;

d)  Symptoms reported by Susan Billings, plaintiff's significant other; and

e)  Medical blood testing.

56.

Employees of Correct Care/Wellpath, including the named Defendants, with deliberate indifference, subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and Article 1 Section 16 of the Oregon Constitution through one or more of the following particulars:

a) choosing to ignore Plaintiff's complaints that he was unable to urinate;

b) choosing not to believe Plaintiff's complaints of abdominal pain;

c) choosing not to adequately examine, evaluate or diagnose Plaintiff;

d) choosing to ignore Plaintiff's repeated requests for medical help;

e) ignoring descriptions by other inmates at the Coos County Jail that Plaintiff be medically treated;

g) choosing to ignore plaintiff's lawyer who described Plaintiff's symptoms to the defendants;

h) choosing to ignore Plaintiff's significant other's repeated reports of Plaintiff's symptoms;

Page 32 – COMPLAINT

LEVI MERRITHEW HORST PC

i) failing to adhere to protocols prescribed for urinary obstruction;

j) failing to recognize that Plaintiff was suffering from renal failure; and

o) ignoring Plaintiff's repeated requests to be treated in a hospital or by a medical worker outside the Coos County Jail.

57.

As a result of cruel and unusual punishment inflicted by the Defendants, Plaintiff suffered from severe pain, fear of permanent injury or death, kidney failure, a permanently distended bladder, and a lifetime of catheterization or incontinence.

58.

For claims arising under 42 U.S.C. § 1983, Plaintiff is entitled to recover reasonable attorney fees and costs of litigation pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

**Cruel and Unusual Punishment through Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and Fourteenth Amendments to the United States Constitution: (Against Correct Care, Wellpath, Coos County, Sheriff Zanni and Darius Mede - in their individual capacities - a claim arising under 42 U.S.C. § 1983)**

59.

Plaintiff incorporates by reference all preceding paragraphs.

### Correct Care/Wellpath

60.

Correct Care/Wellpath is a non-governmental, for-profit corporation that contracted with the Coos County Jail to provide constitutionally adequate medical care for the inmates housed therein.

61.

Correct Care/Wellpath has a fiduciary duty to its shareholders and investors to ensure that it achieves the highest profits possible.

Page 33 – COMPLAINT

LEVI MERRITHEW HORST PC

62.

Correct Care/Wellpath employed and operated the medical department at the Coos County Jail with the objective of financial gain and profit.

63.

Upon information and belief, by policy and custom, and to save money, Correct Care/Wellpath hired unqualified or minimally qualified medical staff to work at the Coos County Jail including Dr. Paul Bilder who has been subject to discipline by the Oregon Medical Board multiple times – in part to his gross negligence involving catheters.

64.

Upon information and belief, by lack of policy or custom, Correct Care/Wellpath did not train its medical staff at the Coos County Jail how to work with and treat people who are in a custodial environment and beset with mental health disabilities, other disabilities, and social problems.

65.

Upon information and belief, by policy or custom, Correct Care/Wellpath did not compensate employees sufficiently at the Coos County Jail. This failure led to a revolving door of underpaid employees and contractors who lacked the commensurate ability to adequately care for patients at the jail.

66.

Upon information and belief, Correct Care/Wellpath failed by custom or policy to supervise its employees and provide adequate quality control in overseeing the quality of the healthcare they provided.

LEVI MERRITHEW HORST PC

67.

Upon information and belief Correct Care/Wellpath, by policy and custom, when confronted with a medically complex patient, would attribute complaints to malingering rather than properly evaluating them.

68.

Correct Care/Wellpath by policy and custom refused to hold its own employees accountable for its errors and failure to follow its own policies.

69.

Upon information and belief, in this case, Correct Care's/Wellpath's policies and customs, led to Correct Care's medical staff's failure to properly medically evaluate Plaintiff's symptoms and timely diagnose his urinary tract obstruction leading to his injury.

**Coos County**

70.

Coos County had a non-delegable duty to provide and ensure that Plaintiff was able to access adequate medical care while he was incarcerated at the Coos County Jail.  This duty is required by ORS 169.140 as well as by the U.S. Constitution.

71.

Upon information and belief, Coos County, had a policy, custom and pervasive practice of failing to enforce its contract with Correct Care/Wellpath, failing to audit Correct Care, failing to train its employees, and turning a blind eye to Correct Care/Wellpath's routinely administered, inadequate medical care for Coos County prisoners.

//

//

LEVI MERRITHEW HORST PC

//

72.

Upon information and belief, Sheriff Zanni is the final decision maker for Coos County with respect to jail policy including jail medical policy and administering jail medical contracts. His duty was to enact his own policies setting the baseline of care; to approve, administer and audit the contract with Correct Care, and to hold Correct Care/Wellpath to the terms of its contract. Coos County is directly liable for Sheriff Zanni's failures of policy under *Pembaur v. Cincinnati*.

73.

Upon information and belief, Coos County, through custom or policy, released inmates, including Plaintiff, before they had served their sentences if they had serious, emergent medical needs rather than properly and adequately treating those medical needs.

74.

This custom, policy and practice undermined the medical treatment and led to a general disbelief by medical staff that any inmate making a medical complaint was telling the truth; this led to a decline in medical care for inmates in general, including Plaintiff.

**Sheriff Zanni**

75.

Sheriff Zanni had a non-delegable duty to ensure that inmates at the Coos County Jail received adequate medical treatment.

76.

Sheriff Zanni failed to adequately supervise and administer Coos County's contract with Correct Care/Wellpath and failed to ensure that it fulfilled its contract by providing adequate medical care to inmates at the Coos County Jail.

Page 36 – COMPLAINT

77.

Sheriff Zanni failed to supervise and oversee his employees– some of whom are named as defendants –  and ensure that they provided adequate medical care to each inmate; Sheriff Zanni did not create measures to ensure that his employees – including defendants Mede and Shobar – transported inmates in medical distress but not receiving adequate care from Correct Care/Wellpath, to an appropriate medical facility.

**Darius Mede**

78.

As Jail Commander, defendant Mede was responsible as defendant Zanni's delegate as Jail Commander, to ensure that inmates at the Coos County Jail received constitutionally adequate medical treatment.

79.

Defendant Mede failed to adequately supervise and administer Coos County's contract with Correct Care/Wellpath and failed to ensure that it fulfilled its contractual obligations with the jail including ensuring that Correct Care/Wellpath provided constitutionally adequate medical care to inmates.

80.

Defendant Mede failed to independently audit whether Correct Care/Wellpath was complying with its contractual obligations.

81.

Defendant Mede failed to penalize Correct Care/Wellpath for its past failures that led to the death and injury to Coos County inmates.

LEVI MERRITHEW HORST PC

82.

Defendant Mede failed to recommend that Coos County's contract with Correct Care/Wellpath be terminated after Correct Care's repeated failures to deliver adequate medical care to inmates.

83.

Defendant Mede failed to ensure plaintiff received appropriate medical care even after plaintiff's lawyer, Mr. Reagan alerted command staff at the jail that plaintiff was unable to pee and alerted that this problem was serious.

84.

Defendant Mede failed to create policies to ensure that any inmate not receiving adequate medical care from Correct Care/Wellpath, and in danger of serious injury or death, was transported to an appropriate medical facility.

**The Acts and Omissions of Correct Care, Wellpath, Coos County, Sheriff Zanni and Darius Mede Caused Plaintiff Harm**

85.

Defendants' policies, customs, failures to train and supervise, are and were the actual and proximate cause of and were a substantial moving force in causing Plaintiff's injuries and his pain and suffering.

**THIRD CLAIM FOR RELIEF**

**Professional Negligence**
**(Against Correct Care and Wellpath, a claim arising under state law.)**

86.

While Plaintiff was incarcerated, he was unable to access medical care on his own.

Page 38 – COMPLAINT

87.

Correct Care/Wellpath's employees and contractors had a contractual duty to provide Plaintiff with medical care commensurate with that provided by other similarly licensed professionals in the community.

88.

The risk of harm to Plaintiff was foreseeable to the defendant's employees.

89.

Correct Care/Wellpath's employees and contractors negligently provided medical treatment to Plaintiff in that they failed to use that degree of care, skill, and diligence used by ordinarily careful health providers practicing in the same or similar circumstances in the same or similar community.

90.

The inadequate medical care provided by Correct Care/Wellpath caused Plaintiff serious physical injury, a risk of death, and permanent disability.

91.

The professional negligence of the Defendants includes, but is not limited to, each of the particulars listed in Paragraph 1 – 91.

**FOURTH CLAIM FOR RELIEF**

**Negligence**
**(Against Correct Care and Wellpath, a claim arising under state law.)**

92.

The Plaintiff incorporates by reference all preceding paragraphs.

93.

Correct Care/Wellpath had a duty to provide proper and adequate medical care to Plaintiff.

LEVI MERRITHEW HORST PC

94.

Plaintiff's pain and suffering was a foreseeable result of Correct Care's/Wellpath's failure to create and enforce adequate policies, failure to train, and failure to supervise employees treating inmates at the Coos County Jail.

95.

Correct Care's/Wellpath's negligence, including the failure of its supervisory staff and policy makers to act include but are not limited to the following particulars:

a)      Hiring unqualified and substandard medical staff and contractors ill-prepared to treat patients in a correctional setting;

b)      Failing to provide training to employees and contractors about urinary blockages and failing to provide adequate protocols for treating urinary blockages;

c)      Failing to adequately train its employees to work with patients, such as Plaintiff, who are affected by physical disabilities and preexisting conditions;

d)      Failing to train employees how to medically evaluate a patient's complaints of illness;

e)      Failing to train employees how to rule out any concern of faking or malingering by completing a full work-up of the patient;

f)      Failing to train employees to document medical interventions in the patient's medical record;

g)      Failing to train employees how to communicate patient medical concerns to other caregivers;

h)      Failing to supervise employees to ensure they follow all protocols; and

LEVI MERRITHEW HORST PC

i)        Failing to implement or poorly implementing a continuous quality improvement

program.

### FIFTH CLAIM FOR RELIEF

**Negligence**
**(Against Coos County and Sheriff Zanni, a claim arising under state law)**

96.

The plaintiff incorporates by reference, all preceding paragraphs.

97.

Coos County and Sheriff Zanni had a constitutional obligation and non-delegable duty to

ensure that Plaintiff was provided with adequate medical care.

98.

Plaintiff suffered a reasonably foreseeable serious, permanent injury and threat of death as

result of the defendants' negligence, including but not limited to, the following particulars:

a)  Relying on a failed contractor (Correct Care/Wellpath) with a history of providing

abysmal medical care to inmates at the Coos County Jail and throughout the United

States;

b)  Failing to ensure that Correct Care/Wellpath abided by its contractual obligations to

provide reasonable medical care to inmates;

c)  Failing to respond to Plaintiff's attorney's concern for Plaintiff's medical wellbeing;

d)  Failing to independently ensure that Correct Care/Wellpath was providing care to

Defendant's inmates by requesting a list of all inmates in medical isolation, including

Plaintiff;

e)  Failing to independently assess each inmate in medical isolation, including Plaintiff; and

f)  Failing to independently send Plaintiff to the hospital for an assessment by a competent medical practitioner.

99.

Plaintiff provided a tort claims notice under ORS 30.275 to Coos County on or about September 26, 2019. City County Insurance Services ("CIS") confirmed receipt of Plaintiff's tort claims notice on October 2, 2019.

**DAMAGES**

**All Claims**

100.

Punitive damages against all Defendants except Coos County are appropriate due to the degree of reprehensibility of the Defendants' conduct which include:

a)  The risk of future harm that Defendants' actions, policies and customs create for other inmates at the Coos County Jail;

b)  The profit that Defendants realized, and will realize, by failing to provide adequate medical care to Plaintiff and other similarly situated prisoners;

c)  The frequency of similar conduct perpetrated by the Defendants on other prisoners;

d)  The Defendants' financial positions;

e)  Defendants displayed a callous disregard for the pain, suffering, and illness of a person who had no options for helping himself or gaining help except from the Defendants; and

LEVI MERRITHEW HORST PC

f)      Defendants displayed and continue to callously disregard vulnerable prisoners nationwide despite settling thousands of individual lawsuits, judgements and claims against them.

101.

Consequently, punitive damages are necessary to deter future violations of the same or a similar nature, and to punish the Defendants.  The Plaintiff requests punitive damages in an amount to be determined from Correct Care, Sheriff Zanni, and from each of the individual Defendants in their individual capacities.

102.

From May 6th through May 24th, Plaintiff suffered abdominal pain, pain in his bladder, pain in his penis, two failed catheterizations, and two surgical procedures. This harm is valued at an amount to be determined.

103.

Plaintiff incurred medical expenses for treatment at the Bay Area Hospital and North Bend Medical Center for a combined amount of approximately $98,882.51.

104.

Plaintiff will incur expenses for the duration of his natural life resulting from defendants' actions.

105.

Plaintiff will endure future pain, suffering and humiliation from soiling himself, carrying around a bag full of urine, constantly visiting the bathroom, catheterizing himself, inability to create intimacy with his significant other, all resulting from the defendants' negligence and deliberate indifference to him.

LEVI MERRITHEW HORST PC

106.

The Plaintiff demands a trial by a jury of his peers.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

a.    Findings and orders that Defendants violated the prohibition against cruel and unusual punishment under the Eight Amendment by being deliberately indifferent to serious medical needs and risk of death to Plaintiff;

b.    Findings and orders that Correct Care and its employees did not provide a professional standard of medical care to Plaintiff while Plaintiff was in the custody of the Coos County Jail;

c.    Findings and orders that Correct Care was negligent in caring for and providing medical care to Plaintiff while Plaintiff was in the custody of the Coos County Jail;

d.    For punitive damages:

1.  In an amount to be determined against Correct Care and Wellpath,

2.  In an amount to be determined against Sheriff Zanni, and

3.  In an amount to be determined from each of the individual defendant;

e.    For non-economic damages in an amount to be determined for Plaintiff's physical pain and suffering and emotional distress experienced by Plaintiff between May 6, 2019 and May 24, 2019;

f.    For past economic damages of $98,882.51 in medical expenses;

g.    For future economic damages in an amount to be determined;

Page 44 – COMPLAINT

LEVI MERRITHEW HORST PC

h.      For future non-economic damages based on Plaintiff's pain, suffering, emotional distress, and humiliation in an amount to be determined by a jury after trial;

i.      For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983, 1988 and 12205 and under other applicable law; and

j.      For such other and further relief as may appear just, equitable, and appropriate.

**DATED** this 16th day of February, 2021.

**LEVI MERRITHEW HORST PC**

By:      /s/ Ethan Levi
**Ethan Levi**, OSB No. 994255
Email: ethan@lmhlegal.com
**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com

610 SW Alder Street, Suite 415
Portland, OR 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

LEVI MERRITHEW HORST PC

Page 45 – COMPLAINT